The next case on the docket is agenda number 15, numbers 130036, 130058, consolidated. This is Waukegan Potawatomi Casino v. Illinois Gaming Board. In this matter, the appellants have agreed to split their time. Mr. Davis will argue for 12 minutes, and then Ms. Hanson will argue for 8 minutes, and in rebuttal, Mr. Davis will have 5 minutes, and Ms. Hanson will have the other 5 minutes. With that, you may begin counsel. Good morning to the court. My name is Glenn Davis, and I do represent the city of Waukegan in this matter. And I wish to greet you this morning and greet counsel, my good friend, Mr. Smith, and counsel for this stage. Your Honor, this case involves an inequitable collateral attack on an agency's decision when that agency was fully vested with plenary authority to act on the matters before it. And in that regard, I would direct you to your Newkirk v. Bygarn case. The inequitable result that we are facing here offers terrible consequences, both to non-parties and to the taxpayers of the city of Waukegan. And that inequitable result is based on a core theory that a single certifying resolution was inadequate on a presentation of applicants for approval by the Illinois Gaming Board. And that boils down to the timing of the resolutions and whether or not they provided the information. So we were confronted with a case that is not a mandamus case. This is a case that's fully inequity. And the Court of Appeals found that the Waukegan Potawatomi Casino had a legally cognizable interest in a, quote, unquote, fair process, and it was traceable. The harm to them was traceable to these resolutions that were somehow intertwined with the conduct of the Illinois Gaming Board and the city. And the court is, I'm sure, familiar from the briefs with the timing of the eventual rulings in the circuit court. But there are at least six important reasons why the court needs to reverse the First District Court of Appeals. First, as I have mentioned, it's a very inequitable result, and there has been no balancing of harm or taking into account the public interest. Second, there is no private right of action that supports the Potawatomi's cause of action here. And we've relied on the Carmichael and Jackson cases and further wish to identify the Rice v. Marathon recent case in this court that addresses the private right of action issue. Further, the Waukegan Potawatomi had no standing to challenge the Illinois Gaming Board's action, and that flows from what I'll get to in a minute, which was the two-stage process that is at it afoot here. Four, the Illinois Gaming Board has exclusive jurisdiction. It has plenary authority under a widely ranging statute, giving it all authority to govern matters dealing with gaming, selection of applicants, policing the industry, all those things. In this regard, we have relied on your decision in J.J. Adventures Gaming, which is an important case and should not be hurt by your review of this case, as well as supported by the analysis in the recent City of Chicago v. City of Kankakee case. Fifth, the city did its little best. It complied or substantially complied or cured anything that may have been wrong with any technical violation of the Illinois Gaming Act with its resolutions. And finally, six, this case was moot when the Illinois Gaming Board awarded Full House, the unrepresented third party here who's invested $175 million in Waukegan, its license. So it's important to note that this is a two-stage process here. You have a certification process where the city, as sort of a gatekeeper, identifies the parties it chooses to do business with and certifies to the Illinois Gaming Board that these are the suitable candidates in the city's view and that they have negotiated with them and reached some form of agreement with them to proceed.  Yes. Does the city's resolution for the other three casinos certify that they met all eight of the requirements in 75? We believe so. We can get into questions here about the definition of agreement for the purpose of this and what's the right definition of negotiations. The resolutions on their face cover each of those items, but they state that there is a general agreement on these items. It is true that there wasn't a final, detailed, signature, final agreement on all details on everything, but the city did refer the Gaming Board to the specifics on the sharing of revenues, what the property is, what the conditions of the casino are going to be. All those things were in the proposals that were submitted, and the applicants were in no position to materially change their position as to what those things were in their proposals. So all of the information that we believe was appropriate was there. So is your position that the attachment to the resolution did constitute a memorialization of the details? Yes, and there's a couple of important things to bear in mind here, and there's a very important timing thing going on here, which I think the court needs to observe. The Illinois Gaming Board did not issue a temporary operating permit to Full House until February 16, 2023. It did not issue a final license until June 15, 2023. The City of Waukegan passed a resolution, R23-R03, on January 3, 2023, which provided for a full development and home development agreement for the entire casino process, as well as the ground lease for the property that was going to be used. So every specific detail that was necessary to have before the Gaming Board for it to perform its function was in the hands of the Gaming Board before it made its decision. So in our view, if you want to parse the language of the resolutions, you can do so, and creative lawyers can always come up with exceptions and disagreements over terms. But the departure here is that everything ultimately was before the Gaming Board that was necessary for it to perform its function. Further, characterizing the Potawatomi's action as simply seeking to force statutory compliance doesn't create a private right of action or create standing, and it doesn't convert this into something where all actions of the Gaming Board after that point were void. That is where they are going here. They are telling you that the Gaming Board, any action it took based on how you parse the language of this resolution, means that all those actions of the Gaming Board were void and lacked authority. And in that regard, I want to point you specifically to your Newkirk v. Beigar case and point out first that nothing in the Illinois Gaming Act declares that anything that the Gaming Board did here was void on its face. There is no express rule of that sort here afoot. Nor does the Gaming Act provide for any procedure for a court action for an injunction or something like that. So, Counsel, are you basically saying that even if the city maybe dropped the ball on something, by the time it reached the Gaming Board, the Gaming Board complied with everything that they were supposed to do, and so it really doesn't matter? That's exactly correct in that one level, Your Honor. And you think about the consequences if it were otherwise, and I want to refer you again to Newkirk v. Beigar. The general rule, it says, this is quoting, the general rule is that a party cannot collaterally attack an agency order in a proceeding such as this unless the order is void on its face as being unauthorized by statute. To accept plaintiff argument would be to disregard the distinction between agency orders which are void and subject to collateral attack and those which are merely voidable and subject to attack only throughout the whole administrative and judicial review proceedings. We decline to adopt such a rule. And I go on to point out that if it were otherwise, any claims violation of the statute would create an argument that the agency lacked authority to do whatever, make whatever decision it is alleged to have made that the other side complains about. This is not a situation where the only Gaming Board received these things and then ran off and awarded five more casino licenses than the legislature authorized. Or it's not a situation where the only Gaming Board decided we're going to dispense with all of the requirements on us to investigate the merits of the proposals and the individuals that are associated with those proposals. So the core allegation here that the single certifying resolution in its language, in the stress of a 128-day process to put together this gaming proposal and run it through the city's process with an RFQ, is unfair to the city. There is no private right of action. And because there's no private right of action, there's also no standing. And no standing under the general factors that support standing or that the court evaluates to determine standing. But remember this is a two-step process. The city did its function. They have disagreements and they allege all manner of things which they're going to try and distract you with about corruption and things like that that's totally irrelevant to the question before the court. And that's been decided adverse to them in federal court by summary judgment. But what is at issue in this case is whether or not the Illinois Gaming Board had authority to make the decision that it made in this case based on the process that it applied. And in our mind, not only did the city comply, at least substantially complied, or in the end cured any noncompliance with the resolution requirement. But this is a two-stage process. There's a causation problem also. The only harm that they can complain about here is how they were treated at the city level and all these things that they want to talk about with Senator Bond and this and that. But what we have here is a review. And the city from the beginning said we're going to go with multiple applicants, not Senator Bond. We're going to structure it so only he gets it. We're going to go with multiple applicants because the city was burdened in the past. I see my time's up. But it was submitted in that way by the city. So I appreciate your time if you have any questions for me. Thank you very much. Ms. Hanson? Good morning. May it please the Court?  I'm Assistant Attorney General Christina Hanson on behalf of the Illinois Gaming Board. It's chairmen, members, and administrators who were students in their official capacities. The appellate court erred in concluding that this claim could proceed. Section 75 of the Act created six new casino licenses, as my co-appellant's counsel said, and directed the board to issue those licenses and to consider applications, quote, only after the city had certified eight items, that the applicant had negotiated with the city in good faith, that they had mutually agreed on certain specified items, that the city had passed a resolution of ordinance in support of the applicant, that the applicant had presented its proposal and made a summary of that proposal available online. In October 2019, the city tendered those requisite certifications to the board for three applicants, but not for WPC. And the board gave public notice that it had received certified applicants and would commence its statutory process for issuing the license. Over the next two years, the board undertook its separate licensing process. As co-appellant's counsel said, this is a two-step process. They tendered their certifications, and then the board commenced an entire licensing process. Counsel, is it your position that the board's involvement only begins at the second step? Yes, the board accepts the certifications. If the city tenders certifications, then those applications, so the three applications that were submitted, are complete, and then the board commences its licensing process. So would you consider the first step kind of a political decision that the city has to make and has nothing to do with the gaming board? Yes, it is the city's decision to sort of present applicants or to certify applicants so that the board can consider them. So the statute gives a role to the host community in selecting who can be an applicant, but from there, the board undertakes its regular licensing process as it did with the prior ten casino licenses before and with all six of these licenses. It investigates the applicants. In this case, because there were three applicants, it conducts its own competitive bidding process and determines votes on a final bidder, determines that final bidder's preliminary suitability for licensure, which in turn allows, in this case, Full House, to construct its casino facility to begin gaming operations to demonstrate its suitability for licensure. Counsel, does the board have any authority or responsibility to take a look at the certification process of the city? There is no clear duty under Section 7E5 for the board to look beyond that a certification was provided, and there was nothing in the certification that would have created any concern about the city's selection of those three applicants. Every item in Section 7E5 was indicated on certifications that the city provided. There would have been no reason for the board to doubt that there were any problems with the certifications. And so the board commenced and completed its licensing process. If the board did have a concern, I'm asking you whether or not they would even have the authority to do anything about it. Could they say to the city, your certification process was inadequate, you should have done this? Do they have that authority? There is nothing under Section 7E5 that would give the board that authority. The provision provides that the board directs the board, upon receiving certifications, to commence a licensing process. So no, there is nothing under the act that would suggest that the board should be looking at the city's process and how it selected its applicants. If it failed to provide a certification, certainly the board couldn't move forward. But the city here provided certifications, and those certifications stated that the certifications were provided pursuant to Section 7E5, and that the items in 7E5 were covered by the certifications. And so the board undertook its statutory licensing process from there. And now that the licensing process is complete, this case is moved. There is no further action that can be enjoined. The board has already undertaken every step of the licensing process, so there is nothing left to be enjoined here. This court's decision in Marion Hospital Corporation v. Illinois Facilities Planning Board is instructive. There, too, there was sort of a two-step process where the planning board issued a construction permit to construct a hospital facility, and then eventually the Illinois Department of Public Health would issue an operating license. A competitor of the Permit E challenged whether the construction permit was valid. In the meantime, in Marion Hospital, the Permit E completed construction of its facility and obtained an operating license, having submitted to the Illinois Department of Public Health its construction permit. Because that construction permit had never been invalidated, or the Department of Public Health had never been enjoined from proceeding with the issuance of its operating license, this court held that the claim became new. And that's precisely the situation here. WPC challenged the city's selection process in a separate lawsuit. They also moved for a temporary restraining order in this case to prevent the board from moving on with its licensing decision. But the certifications that the board accepted as part of its application have never been invalidated, and the board has never been enjoined from issuing the license. And so the board proceeded under its statutory duty to issue a license in this case for the benefit of the people of the state of Illinois. I'd just briefly like to address, too, that the appellate court held that the case could still go forward because the board could be found to have acted without jurisdiction. But when we look at whether an agency has jurisdiction, we look at whether the enabling statute, whether the action that they have undertaken is outside the scope of the authority under the enabling statute. And here that is not the case. Under Section 5B of the Act, there's no doubt that the board has general jurisdiction to issue casino licenses, and under Section 75.3, it specifically had authority to issue the Waukegan license. Any disputes about whether the certifications were complete or whether the board should have accepted them, any of those questions could possibly go to whether the board's decision was voidable, but it certainly couldn't go to whether it was void. The gaming board had jurisdiction to proceed and did so. Please bring your remarks to a close. Your red light's on. Thank you. Good morning, and may it please the court, counsel, Dylan Smith for Waukegan Potawatomi Casino, which I'll probably refer to as Potawatomi during my argument just because it's a bit of a mouthful. Section 75 of the Gambling Act provides that the gaming board shall consider issuing one of the six new licenses only after the city certifies to the board that certain things specified in the statute have already occurred. Now, until the Assistant Attorney General stood up for argument here, the gaming board, represented by the Attorney General, has never argued that the city complied with Section 75, and I'm not talking about the underlying process. I'm talking about those resolutions that were provided to the board. Remember that we're here on an appeal at the pleading stage, and on the facts pleaded, the city failed to satisfy this precondition that the General Assembly... Tell me how specifically, how they failed to satisfy it. Sure. Your Honor, the statute specifies very clearly, the board may consider issuing a license only after the city certifies to the board, and then it specifies the other things in Section 75. The resolutions on their face, to begin with, fudge the statutory language by saying as to each of those items, which are usually... They're a series of agreements. So they fudge the language by stating the applicant and the city have, quote, generally agreed, generally agreed, generally agreed on items within the zoning, jurisdiction of the city, and so forth. Does the gaming board have the authority to look behind the meaning of those words in whatever resolution the city passes with respect to certifying the candidates? That's a fair question, Justice Cunningham, and let me answer it by saying this first. Here they didn't have to, because in addition to fudging the statutory language, in that same resolution on its face, the city then said, and by the way, for the details of those mutual agreements, referring back to the required certifications that Justice made, look at the proposals these guys submitted, and we plan to negotiate after the fact. Well, the whole premise of the General Assembly here, and this was a choice made for the six new licenses very deliberately, a different regime from the original 10 licenses, was to say there's going to be negotiation and mutual agreement up front at the municipal level. Why does it say that? Well, if you look at the statute as a whole, and I do want to get back to answering your question, Justice Cunningham, you have the licensing regime for the original 10 licenses, and you have a very different licensing regime for the six new licenses under the gaming expansion law. So here what the gaming board had was something that very clearly didn't match up with the certification. They made it pretty simple. They said, here's what you have to certify, and as we put in our complaint, when the city of Rockford did it, for example, they matched the statutory language. They just chose to make up their own, on the face of it, the certifying different language than is in the statute, and then kind of advertised they weren't complying with the statute. Now, as it happened, then when we filed our complaint, and keep in mind there's been some suggestion that this complaint was filed too late. But first of all, first of all, sure. I want to ask a follow-up question to the first one that you didn't really answer. But the second, when does the gaming board's oversight actually begin? Is it at the first step, first stage, or the second? Same question I asked you. Yeah, I think the gaming board's role here, Justice Cunningham, is they have to, the city keeps saying, or I'm sorry, the gaming board keeps suggesting that what the board does is accept the certification. And I would say that the gaming board's role here is, at a minimum, to look at the certifications provided and say, does this match up with the statute? Because as we say in our brief, and I think they're inverting the situation here. Do they have authority to do this? Do they have authority to do that? There are only six new casinos under this statute. This is a threshold restriction on their authority to act. It's very clear it can act only after, it can consider issuing a license only after. And with respect to counsel, I believe the presentation of what this court's precedent on agency authority is, is incomplete. And what both the gaming board and the city have argued in essence, whether they're talking about exclusive jurisdiction or mootness or claiming that the gaming board's, quote, had authority to issue the licenses. They're saying, look, the gaming board has broad authority over casino licensing in Illinois. And so it must have had some inherent authority here to move forward. So to answer your question, Justice Cunningham, what happens under the statute is not that there's a stage one and the city provides a certification and then the gaming board just takes those. Because that's not the way the statute is written. These aren't certifications we think of certified, makes you think of maybe a professional license or something like that. But these are certifications to the board that these things have happened. And the certifications they provided didn't match up with the statute, which is a threshold restriction on its authority. Now, this court's teaching when it comes to agency authority is that agencies are a creature of statute. And what constitutes agency jurisdiction or the power to act consists not just of what's sometimes called subject matter jurisdiction or the power to decide generally a category of cases or to administer a particular area, but also specific statutory authority. Personal jurisdiction, subject matter jurisdiction, and statutory authority. And, by the way, there's agreement between the parties that if an agency acts without statutory authorization, its actions are void. That is a premise of the Attorney General's argument to this court. Because what they are saying in their mootness argument is that because the gaming board had, quote, jurisdiction to issue the license, it can't be retracted now. But the premise that they acknowledge is that if they lack jurisdiction, the license is void. And this is very clear strain in the case law going from Newkirk through Gorrell v. Dart, where the court most recently talked about those three components of agency jurisdiction. Newkirk was nothing like this case. That was a situation where the mining board clearly had authority to issue a certain type of order, and there were some technical defects in the order. And the court went through why those were technical defects. There wasn't any question about the agency's statutory authority to act. Here you have a threshold restriction on the board's authority to act. And one of the things the court did in Newkirk was to talk about why those were technical defects. There's no way to look at the specific language of the statute or the statute as a whole, which is the appropriate mode of statutory analysis, and come to the conclusion that this is just a technical issue. Can I ask you a question about standing? Sure. In Illinois, standing requires only some injury in fact for a legally recognizable interest. More precisely, the claim injury must be distinct and palatable. Elsewhere we've said a distinct and palatable injury refers to any injury that cannot be characterized as generalized grievance common to all members of the public. What distinct and palatable injury has your client been injured? Yeah, thank you, Justice Tice. Well, obviously, Pottawatomie participated in the city's process, accepted its invitation to pay the fee, participate in the process. It is not just a general member of the public. And one thing that is clear from the case law, and this does not begin and end with the competitive bidding statutes, as the defendants have tried to suggest, is that the lost opportunity to participate in a lawfully conducted process is a cognizable legal interest. Now, what the defendants do in response to that principle, the arguments they made can really be divided, I think, into two categories. One, that's an argument that's a little more factual in nature than the legal. So the factual argument that defendants are essentially making is they're saying, look, Pottawatomie had, quote, no chance, ultimately, because the legal argument. The argument, again, what is the specific injury here? You argued that just generally you were injured because the process itself was flawed, and therefore that was the injury to your client, basically. The process did not comply with the Gambling Act, and that had a material impact. They basically changed the end point of the process. So other than this sort of statutory injury, what case do you have to support your argument? Now, you're right. The opponent says the cases that have been talked about are a much different kind of cases than the competitive bidding cases, where it's very clear who is in the ballpark here. They argue that's not what this is. Anyone could file an application, and anyone could not be granted an application. Specifically, how do you define more than just a statute, that they didn't follow the statute? Sure. What specific probable direct injury has your client suffered? Okay, so Chief Justice says, I want to answer that both as to the factual component of that, and I think there's a legal component to it, too, in terms of what is the nature of the interest that's sufficient. So factually, let me just say, factually, one of the things this Court instructs is that you can't, by virtue of looking at an unlawfully conducted process, speculate about what would have happened in the lawfully conducted process. Now, that said, I think we go beyond notice pleading in our complaint and offering examples of why, as a practical matter, the failure to comply with the statute impacted the fairness of the process, and to Potawatomi particularly. For example, by foregoing negotiation, deciding, as their own counsel said, to negotiate after the fact, they basically changed the end point of this process where they hand it off. We know that the city had announced its intention to certify multiple applicants. One of those applicants, Northpointe, advised the city's attorney ahead of time, hey, listen, we know you actually need to reach agreement to comply with the statute. Just so you know, if you certify multiple applicants, our offer that you think you have in our proposal, and this goes right to the question of whether these proposals are adequate. They said, just so you know, our proposal is no good if you sign it. I mean, you kind of didn't have a protectable interest, a vested interest in having the application certified, right? We had an interest in a process where the end point was that the city reaches mutual agreement and is in a position to certify to the gaming board truthfully, we have reached mutual agreement on the required items, and there is agreement on X, Y, and Z. Because if they don't, and they don't do that, you have what happens here, which is you don't have what the General Assembly clearly prescribed in the statute, which is upfront negotiation, transparency, some measure of finality. What counsel represented is not what occurred in this process. This was the opposite of what the General Assembly had in mind. So, for example, I mean, our time is limited. Your opponent lists, I think it's six reasons the Federal court said, whatever the process, Patamon was going to lose, right? I mean, so, again, my question, how have you been injured here? Other than saying this was because they didn't follow the statute. You didn't get a license. You don't have an invested right or a vested right in getting a license. The Federal courts have found there are lots of reasons why you didn't get the license. So I want to talk about the Federal court case, because I don't think that really has bearing here, because the court did not actually opine on what actually occurred there, given the standard applicable to a class of unequal protection claim. But as a practical matter here, what happened is, as we allege in the complaint, that because the city council did not negotiate mutual agreement with the applicants, they were able to gloss over, ignore contingencies, weaknesses in the other applicants' proposals, and it wasn't a fair process. So if the city council votes on North Point, thinking, okay, I've got a resolution that says they're going to do what's in their proposal, and North Point has advised some members of the city, hey, listen, just so you know, if you certify multiple applicants, our proposal is not that. It's going to be the least favorable proposal that's been submitted to you. That never got fleshed out in the process. The process didn't have the end point that the General Assembly prescribed. Here's another example. Full House, which is the licensee. If you look at the record, and this is C-1541, this is long after the city has sent its resolutions to the gaming board. It's after Full House has been listed as the presumptive licensee. The new city attorney goes to the city council and says, hey, we need to hire outside counsel. We've got to negotiate all these things, including stuff that's within our zoning power, et cetera, the very kinds of things that the legislature said should be negotiated up front. And the city has invited the court to take judicial notice of what happened at the June 15, 2023 meeting before the Illinois gaming board. Well, two things happened at that. They purported to issue the license to Full House, and they granted them an extension on the temporary casino. And one of the things they asked when they granted that extension, they said, hey, your proposal says you're going to open this casino and there's going to be an entertainment venue and there's going to be a boutique hotel. If we grant you this extension, are you going to have all those three things open, as you said, in your proposal? And the Full House CEO, candidly to his credit, said, well, I don't know if it will happen soon after, but our proposal is to get the casino open. And if you look at that host community agreement, which is in the supplemental appendix of the plaintiffs that they cite, one of the clauses in there, and I can give you the record cite from this, but it basically allows Full House to pay a $750-a-day fine if that boutique hotel and the entertainment venue aren't open with this casino. Counsel, who would they pay the fine to? To the city. Okay, and what's wrong with that? There's nothing wrong with that, Justice Cunningham. It seems to me that you are describing a process that your client doesn't like, but if the city and the company, whatever that company is that got the license, worked that out and that's okay for the city and the people of Waukegan, where in the statute does it say that they can't do that? Because what the statute says and what it clearly requires is that there is going to be a mutual agreement up front and some definition of the casino. They agreed. I mean, you may not like the agreement, but it sounds to me like they agreed to whatever it was that you just described and the gaming board seemed to have felt that that satisfied their criteria. I'm trying to find out what gives you the standing, as Justice Tice asked, to be here. Justice Cunningham, they agreed after the fact, and what the statute envisioned was there would be agreements, some basic agreements on the details of the casino up front, and in our complaint, it makes very clear that what the city did was the exact opposite of that. They decided to pass applicants along to the gaming board first and negotiate after the fact. That is not what the General Assembly prescribed, and what they prescribed was something that very clearly put a limit on the gaming board's authority.  So let me ask you one final question. The reply brief, because you had a different voice, you talked extensively about this is an equitable relief that we're looking at. So what is the relief you're looking for? What is the remedy here? Is this injunctive relief? Is it mandamus? The argument is, of course, mandamus doesn't quite work here where these are all discretionary decisions by the gaming board. So how do you fit your complaint into a cognizable equitable claim? Sure. Chief Justice Tice, thank you for raising that. So first of all, on that equitable argument, which arises for the first time in the city's reply brief, as you point out, what they're citing is a case out of the Western District of Michigan called Latvia, and the reason I mention that is that case and the distinction between what we have here goes directly to your question, Chief Justice Tice, because the issue in Latvia was a municipal ordinance and the challenge there was a First Amendment challenge that the plaintiffs were successful in getting declaratory relief on. That had gone up and down to the Sixth Circuit and had gone through summary judgment. So one, not an appropriate case to cite where we are procedurally, but more fundamentally, if you read Latvia, and this is key, the district court judge here says, well, with a First Amendment challenge like this, the ordinance is not void ab initio, and that's why I have to exercise my equitable powers to decide what further relief is appropriate. Here we have pleaded an appropriate case for mandamus, and I would refer the court to Noyola, which both parties cite, and what, if anything... You say you do have a claim for mandamus? Yes. And the argument is that obviously a claim for mandamus is one where there's an order to a public official to do some sort of act, and not where it doesn't apply where there's a discretionary act. That is the argument defendants have zeroed out. Well, isn't that, that's the law, right? That is the law, and I would... So why is, isn't this, if I could extend your time a minute. I'm out of questions. Why is this not improper mandamus, where what you're asking for would be an order to a public official to do something that is discretionary? The argument is, Chief Justice Tice, that the Gaming Board does not have discretion to ignore a clear statutory restriction, a threshold restriction on its exercise of authority, and if I could... The action you're asking them to take is to have new hearings, basically. Well... You're asking, mandamus says, the court says to the public official, you must do something. You are asking them to do something for the reasons you just stated, but if the decision-making of the board is discretionary, how could that possibly be a mandamus? Well, first of all, Justice, Chief Justice Tice, what is not discretionary is the board's initial authority to act. So you're talking about the city's certification process. Well, not necessarily the process, but at a minimum the resolutions did not certify to the board what needed to be certified. And as we point out in our brief, mandamus will lie when state agencies, state actors have acted without authority. And the defendants really made the same argument in Noyola, right, which involved the school board's use of Chapter 1 funds for needy students. And if anything, if anything, the defendants there had a stronger argument to say this is discretionary. Let me just... I know we're out of time, but to answer your question, you did tee me up, so let me just... Let me just read what the court said in Noyola very briefly. The responsibilities vested in the state board of education do not include the right to censure expenditures of Chapter 1 funds contrary to the dictates of the statute. They were rejecting the same discretionary argument. And what they said was the state cannot justifiably claim interference with its functions when the act complained of by plaintiffs is unauthorized by statute. And at the end of the day, this is not about an underlying process. With due respect, Justice Cunningham, it's not about a political decision. The General Assembly made it very clear the gaming board had authority to act only after the city certified X, Y, and Z. The city didn't do that. The gaming board did not have authority, and it was inappropriate to dismiss this complaint at the pleading stage, and we ask you to affirm the First District's judgment. Thank you very much, Counsel. Thank you for your questions. They're illuminating, and I want to start with who has it backwards and who has it wrong. The Potawatomi did not like the outcome, and I think this was suggested by some of the court's questions. They didn't like the outcome, so it must have been that the Illinois Gaming Board was without authority because that's the only conceivable basis on which they can try to get something done now, and that's just not so. The city certifications, as I argued previously, were adequate. There was no requirement that you reach a definitive agreement on all elements of the deals that are going to happen. And there's nothing wrong in a situation where you start off with five proposals, paperwork is this high, you whittle it down by the time you go to the gaming board, your certification process to four, and then you decide that one doesn't make it, and you send that on to the gaming board. There's nothing wrong with completing details on those proposals when the ultimate party is selected, and that's what happened here. Counsel, I can't help but ask. If you had the chance to do it all over again, would you comply with the statute and certify according to the exact language of the statute? Well, you know, thank you for the question. The statute is really not all that clear in what it expects the city to do. Well, the statute says that you're to certify that there's been a mutual agreement on certain things. That's the language. Yeah, and to listen to the argument, you would think that nothing happened at the city, that they just gathered the papers and sent them on. Did you certify a mutual agreement on those items? We certified there was general agreement on those items. Right, so my question is, if you had the chance to do it all over again, would you follow the statutory language? I think there's probably always a better way to do things. I guess my concern is, would we be sending the wrong message if we say that you were right in not using the language in the statute? I don't think it goes quite that far because this is a very one-off type situation, Lockview case notwithstanding, if I want to get to it. The situation here is very unusual because you have these multiple applicants going in. Rockford is a single applicant. Everything's submitted. Yeah, we can finish the negotiations and send in a resolution. Their resolution doesn't say anything much different. They just attach their development agreement. And we did provide a development agreement before the gaming board acted. So I think ultimately we complied. There's been kind of an unfair attack here on then-City Corporation Counsel Bob Long. He's been accused of trying to rewrite the process and everything. What he said was, there is no way for us, with all of this information, to negotiate all these details with all these parties to complete satisfaction at this point. We are going to reach general agreement, and we're going to certify that. We're going to certify there were negotiations. And there were negotiations because they had individual meetings with all of the applicants, individual private meetings with all of the applicants to go over the terms of their proposals. It was not a situation where we just got their papers, liked the pictures, certified. Or didn't. That's not what happened here at all. Counsel answered this question for me. There's a whereas clause that says, whereas the City and the applicant have mutually agreed, in general terms, on the percentage of revenues to be shared with the City. That means no percentage has been set? They have a general agreement based on the proposal, which was attached to the resolution. But my question, Counsel, is, has a percentage been set? A percentage of revenues been set? At the time of the resolution, I don't believe so. A specific percentage, no. Thank you. They had what they thought they could rely on. So, the lack of your case, I think, is important to get to because we're dealing with, as I mentioned, and look at the amicus brief for the harm that's involved here. The 1st District made no effort to consider the equities of the situation and the harm that was involved here. The Lockheed case was very well reasoned. I know it's not binding on this Court whatsoever, but if you read that case, it's a very instructive guide on how to look at the balancing of the harm and public interest issues that are at stake. Other questions? Thank you, Counsel. I just wanted to address Appleby's points about the Board's jurisdiction. We didn't just argue that the Board had general jurisdiction to issue licenses, but in the context of Section 7E5, the Board is specifically directed to issue the Waukegan license to consider applicants for the Waukegan license upon receiving certifications from the City, and that is exactly what happened here. In this case, the Board didn't act outside of the scope of its authority. Its authority was to accept certifications and issue licenses, and that's precisely what the Board did here. The Board didn't undertake an obligation that it wasn't specifically directed to undertake. I would appoint this Court to its decision in Genius v. County of Cook. In that case, too, there were some allegations about whether the act that triggered a County Appeal Board's jurisdiction to commence a proceeding over a discharge case actually triggered its jurisdiction because there wasn't an actual discharge decision but a recommendation for a decision, and this Court held that the Appeal Board still had jurisdiction to consider the case because that is what the Board in that case was tasked with doing, is hearing discharge cases and making decisions on those cases, and that you have to look to the context of the case to see if the error was so fundamental as to be deemed jurisdictional, and in this case it wasn't. The City submitted certifications that covered the points of Section 75, and so the Board accepted the certifications and commenced its licensing process. Yes, so the Board, when they get a certification, they have no authority to say this doesn't meet the statutory requirements. For instance, as Justice Novell pointed out, if there's no mutual agreement regarding percentages, how is it that the Board says that that criteria is satisfied? Well, the certifications indicated that there was some level of mutual agreement on these items, and that was the City's separate process. The issue here is whether the Board had statutory authority to act, and it certainly did because it carried out its specific statutory function of proceeding with licensing, of considering applicants for the license. So it's the Gaming Board's theory that it is to accept any certification as meeting the criteria? If it is the host community's certification as to the items in Section 75, then yes, and that would commence the Board's jurisdiction to commence its licensing process. Do the findings in the federal case have collateral stock low fact? Certainly, the findings... That was raised in the flag brief too. Yeah, the findings of the... We raised it in connection with the standing argument because the plaintiff doesn't have standing to bring its claim because it doesn't have an interest in the license, and there was the... Yes, I think they do have... I think the findings of the federal court can have collateral stock low fact on the issue of whether there was some sham certification process that affected the decision here. And lastly, I wanted to address a plaintiff's argument under NOYOLA. Any claim for mandamus here would be moot for the same reason that plaintiff's initial complaint is moot. In NOYOLA, it was an ongoing funding decision that mandamus issued because there was something that the agency could still be... An act that the agency could still be required to take or not take. Here, the license is issued, so there is no claim for... Any claim for mandamus would be moot, just like the complaint was moot. Those are things we ask that you deliver to the appellate court. Thank you very much. The next case is agenda number 15. Numbers 130036, 130058, Waukegan Potawatomi Casino v. Illinois Gaming Board will be taken under advisory.